UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

John Castro and Joyce Castro,

                                Plaintiffs,

    v.

Colgate-Palmolive Company *et al.*,

                                Defendants.

**Report and Recommendation**

19-CV-279 (JLS)

---

**I.   INTRODUCTION**

Plaintiff John Castro believes that he has spent decades of his life using talcum products without realizing that they contained asbestos. John and his wife Joyce now believe that asbestos from talcum products caused John's disease of mesothelioma. John and Joyce accordingly have sued Colgate-Palmolive Company ("Colgate"); CVS Pharmacy, Inc.; Cyprus Amax Minerals Company; Giant, LLC; several corporate entities related to Johnson & Johnson ("Johnson & Johnson," collectively); Revlon Holdings, Inc. ("Revlon"); and some other defendants under various theories of product negligence and strict product liability.

The case comes before the Court now to address a peculiar procedural phenomenon: "snap removal." The case began in state court; according to electronic stamping from the state-court system, John and Joyce filed their verified complaint on February 28, 2019. No more than 24 hours later, on March 1, 2019, Johnson & Johnson learned of the filing before even being served and removed the case to this District before any defendant had been served. Johnson & Johnson filed this immediate, or "snap" removal, to avoid what would have been a prohibition on removal had the New York defendants in the case been served. John and Joyce objected to what they consider procedural gamesmanship and filed a motion to remand to state court. (Dkt. No. 15.)

Unfortunately for John and Joyce, their motion to remand came just four days before the Second Circuit issued an opinion that condoned Johnson & Johnson's procedural maneuver.

This case was referred to this Court on January 27, 2020 under 28 U.S.C. § 636(b). (Dkt. No. 71.)[1] On April 8, 2020, the Court held a status conference with the parties during which the parties discussed the case informally and agreed that all motions pending at the time would be deemed submitted. (Dkt. No. 84.) The Court is mindful that other motions remain pending (Dkt. Nos. 45, 63, 87) but wanted to address the motion for remand first because, in its experience, any remand motion has the potential to implicate subject-matter jurisdiction.

Having considered all the motion papers and having heard from the parties at the recent status conference, the Court now respectfully recommends denying John and Joyce's motion for remand.

## II.  BACKGROUND

This case concerns allegations that John developed mesothelioma after decades of exposure to asbestos, and that at least some of the asbestos came from talcum products that he used throughout his life. The case originally began with a verified complaint that John and Joyce filed in state court on February 28, 2019. (Dkt. No. 1-2 at 11–45.) In the verified complaint, John and Joyce described themselves as residents of Virginia. (*Id.* at 12.) John and Joyce pled, as would have been appropriate for state-court purposes, that some defendants were "at home" in New York but that all defendants at least transacted business there. After identifying the parties, the verified complaint became somewhat confusing, possibly due to language borrowed from complaints filed in

---

[1] The case originally was assigned to District Judge Elizabeth Wolford, and Judge Wolford had issued a non-dispositive referral. (Dkt. No. 9.) On January 3, 2020, this case was reassigned to newly appointed District Judge John L. Sinatra, Jr. (Dkt. No. 70.) On January 27, 2020, Judge Sinatra expanded the referral to include dispositive motions.

other cases. Although all of the defendants appear to be cosmetics manufacturers, pharmaceutical companies, or retailers, the verified complaint contained a reference to distributing and selling "raw asbestos fibers of various kinds and grades." (*Id.* at 18.) The verified complaint also referred to coming into contact with "asbestos products while working in various shipyards, steel mills, refineries, paper mills, chemical plants, industrial sites and facilities, construction sites and other facilities or was exposed to the defendants' products through the normal use of these products." (*Id.* at 19.) As far as the Court can tell, no defendant is a shipyard, steel mill, refinery, paper mill, chemical plant, or industrial site. In any event, the verified complaint did contain language about how, according to John and Joyce, every defendant had something to do with talcum products reaching the retail market. John and Joyce pled further that defendants did not do enough either to keep asbestos out of their respective products or to warn consumers about possible asbestos exposure. The verified complaint contained claims of negligence, breach of warranties, and strict products liability. The verified complaint then veered back into confusing territory by including claims for violations of the state labor law; for negligence by the contractor defendants for unsafe plans regarding the demolition of buildings; and for premises liability, among yet other claims.

     Johnson & Johnson removed the case to this District by filing removal papers on March 1, 2019, just one day after the date of electronic filing stamped by the state-court system on the verified complaint. (Dkt. No. 1.) The 24-hour timing of the removal—Johnson & Johnson almost certainly was not served within 24 hours of filing and likely had means to monitor court dockets daily for activity against it—plus the language that no other defendant had "been properly joined or served" (*id.* at 2) indicated that this removal was what some call a "snap removal." The speed of the removal meant that Johnson & Johnson did not avail itself of the provisions of N.Y. CPLR 3017(c) to obtain a specific damages demand from John and Joyce. Instead, Johnson & Johnson asserted that the

3

amount in controversy likely exceeded $75,000 based on the nature of the claims in the verified complaint.  To date, John and Joyce have not contested that they seek over $75,000 exclusive of interest and costs.  With respect to diversity of citizenship, Johnson & Johnson asserted that no defendant could claim Virginia as a place of incorporation or as a principal place of business.  Additionally, and critical to the pending motion for reasons that will be explained below, Johnson & Johnson asserted that no other defendant had been "properly joined and served" as of removal.  This latter assertion was important because of the path that Johnson & Johnson took to reach federal court.  Under 28 U.S.C. § 1441(b)(2), a case otherwise removable "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  Johnson & Johnson has conceded that two defendants—Colgate and Revlon—plausibly have a principal place of business in New York and thus would count as citizens of New York for removal purposes.  The New York citizenship of two defendants would implicate Section 1441(b)(2), but Johnson & Johnson has attempted to avoid the problem by removing the case immediately, before the New York defendants literally were "properly joined and served."

John and Joyce cried foul over what they considered Johnson & Johnson's gamesmanship with Section 1441(b)(2) and filed the pending motion to remand on March 22, 2019.  John and Joyce's short argument relied entirely on Section 1441(b)(2), and based on that statute, they considered the removal "utterly baseless."  (Dkt. No. 15-1 at 6.)  Just four days after John and Joyce filed their motion, the Second Circuit issued its opinion in *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019). The Court will discuss *Gibbons* in more detail below; in effect, the Second Circuit sidestepped any policy considerations about the fairness or absurdity of snap removals and found that such removals are not inconsistent with the plain text of Section 1441(b)(2).  *Gibbons*

4

formed the entirety of Johnson & Johnson's opposition to remand. (Dkt. No. 26.) In reply, John and Joyce have tried to distinguish *Gibbons* by highlighting language in the opinion suggesting that the Second Circuit authorized snap removals only in limited circumstances that would not create fundamental unfairness for plaintiffs.

### III.    DISCUSSION

The basics of removal and remand are straightforward. District courts have original jurisdiction over any civil action in which the amount in controversy exceeds $75,000 and the litigants have diversity of citizenship. *See* 28 U.S.C. § 1332(a) (Westlaw 2020). For purposes of diversity and removal, and with exceptions not relevant here, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." *Id.* § 1332(c)(1). Procedurally, "[a] defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." *Id.* § 1446(a). With diversity jurisdiction, "the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that the notice of removal may assert the amount in controversy if the initial pleading seeks . . . a money judgment, but the State practice . . . does not permit demand for a specific sum . . .; and removal of the action is proper on the basis of an amount in controversy asserted under subparagraph (A) if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a)." *Id.* § 1446(c).

Removal is a unilateral action, but plaintiffs who believe that a removal occurred improperly can make a motion for remand under 28 U.S.C. § 1447(c). The removing party bears the burden of proving that remand was proper. "As [a removing party] is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence." *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *accord Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010) ("The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it.") (citations omitted). Parties seeking remand enjoy the benefit of the doubt. "The right to remove a state court action to federal court on diversity grounds is statutory and must therefore be invoked in strict conformity with statutory requirements. In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1045–46 (2d Cir. 1991) (citations omitted), *superseded in part on other grounds by* Fed. R. Civ. P. 5, 83 (1995 amendments), *as recognized in Contino v. U.S.*, 535 F.3d 124 (2d Cir. 2008).

Here, the amount in controversy is not an issue. Johnson & Johnson did not avail itself of the provisions of CPLR 3017(c), and this Court has warned removing parties in the past about the

6

risk that ambiguities surrounding the amount in controversy can undermine a removal.  *See Ortiz v. JCPenney*, No. 16-CV-569W, 2016 WL 6694249, at *6 (W.D.N.Y. Nov. 15, 2016), *report and recommendation adopted*, No. 1:16-CV-0569 EAW, 2016 WL 7131559 (W.D.N.Y. Dec. 6, 2016).  Nonetheless, John and Joyce have not contested Johnson & Johnson's assertion that the amount in controversy likely exceeds $75,000.  "[A]s specified in § 1446(a), a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.  Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  Johnson & Johnson thus has satisfied the removal requirement concerning amount in controversy.

As for diversity of citizenship, despite John and Joyce's valiant efforts to explore the penumbras of the language in *Gibbons*, the holding of *Gibbons* compels denial of their motion.  Despite some complexities pertaining to multidistrict litigation, the procedural scenario in *Gibbons* regarding removal was the same as it is here.  "In the usual case, application of the forum defendant rule is straightforward: a defendant is sued in a diversity action in the state courts of its home state, is served in accordance with state law, attempts to remove the case, and is rebuffed by a district court applying Section 1441(b)(2).  Here, however, Defendants removed each of the Transferred Actions to federal court after the suit was filed in state court but *before* any Defendant was served."  919 F.3d at 705 (citations omitted).  The Second Circuit examined the plain text of Section 1441(b)(2) and chose to follow the reasoning of the Third Circuit in *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147 (3d Cir. 2018), *reh'g denied* (Sept. 17, 2018).  "The statute plainly provides that an action may not be removed to federal court on the basis of diversity of citizenship once a home-state defendant has been '*properly* joined and *served*.'  28 U.S.C. § 1441(b)(2) (emphasis

7

added).  By its text, then, Section 1441(b)(2) is inapplicable until a home-state defendant has been served in accordance with state law; until then, a state court lawsuit is removable under Section 1441(a) so long as a federal district court can assume jurisdiction over the action." *Gibbons*, 919 F.3d at 705.  The Second Circuit's reasoning leaves no play in the joints that would help John and Joyce here.  John and Joyce read too much into the phrase "limited circumstances" in *Gibbons*.  The Second Circuit's full sentence using that phrase is as follows: "Put simply, the result here—that a home-state defendant may in limited circumstances remove actions filed in state court on the basis of diversity of citizenship—is authorized by the text of Section 1441(b)(2) and is neither absurd nor fundamentally unfair." *Id.* at 707.  The full context of the reference to "limited circumstances" makes clear that snap removal is, in itself, the limited circumstance that allows a home-state defendant to do what otherwise would be prohibited by the plain text of Section 1441(b)(2).  Just a few weeks ago, the Fifth Circuit endorsed the same reasoning.  *See Texas Brine Co., L.L.C. v. Am. Arbitration Ass'n, Inc.*, ___ F.3d ___, No. 18-31184, 2020 WL 1682777, at *3 (5th Cir. Apr. 7, 2020) ("Of some importance, the removing party is not a forum defendant.  Diversity jurisdiction and removal exist to protect out-of-state defendants from in-state prejudices.  The plain-language reading of the forum-defendant rule as applied in this case does not justify a court's attempt to revise the statute.") (citation omitted).

      In light of *Gibbons*, this Court takes no position on the policy argument that John and Joyce, and others, have made about snap removals: They are a fundamentally unfair absurdity that undermines what Congress clearly intended in Section 1441(b)(2).  The most that the Court will say about the policy of snap removals is that they likely are a creature of modern technology.  Back when new cases could be filed only in hard copy by physically appearing at the Clerk's Office window, snap removals were logistically impossible.  In the era of paper filing, filing removals as

8

quickly as Johnson & Johnson did here would have required posting a paralegal or private investigator at every Clerk's Office window in every state courthouse in the country, to spy on every physical filing for a mention of a particular defendant.  Those paralegals or private investigators likely would have needed a lot of quarters in their pockets, to make immediate calls on payphones to the defendants who hired them.  In the era of 24-hour electronic filing, the Court is vaguely aware of third-party services that exist to monitor docket activity nationwide on a daily basis for new cases involving specified defendants.  Whatever Congress intended with Section 1441(b)(2), modern technology appears to have created a gap between what was intended and what is now technically possible under the literal language of the statute.  As the Court once noted in a different context, updating statutes and regulations in the face of categorically new technological advances is for Congress and not for the judiciary.  *See United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919, at *7 (W.D.N.Y. Dec. 1, 2016) (report and recommendation) ("Given the options available for future regulation, any discussion about regulating virtual currencies is best left to the political process."); *see also Texas Brine*, 2020 WL 1682777, at *3 ("In statutory interpretation, an absurdity is not mere oddity.  The absurdity bar is high, as it should be.  The result must be preposterous, one that no reasonable person could intend.  In our view of reasonableness, snap removal is at least rational.") (internal quotation marks and citations omitted).

## IV.  CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying John and Joyce's motion for remand (Dkt. No. 15).

## V.  OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the

recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted). "In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an

unfavorable recommendation—shift gears before the district judge." *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) (citation omitted).

    SO ORDERED.

                                                __/s Hugh B. Scott_____

                                                    Hon. Hugh B. Scott
                                                    United States Magistrate Judge

DATED: April 29, 2020